J-A29018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FELIPE VAZQUEZ | : | |
| | : | |
| Appellant | : | No. 1123 WDA 2021 |

Appeal from the Judgment of Sentence Entered August 17, 2021
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0005098-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FELIPE VAZQUEZ | : | |
| | : | |
| Appellant | : | No. 1124 WDA 2021 |

Appeal from the Judgment of Sentence Entered August 20, 2021
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0005102-2019

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.: **FILED: MARCH 13, 2023**

In this consolidated appeal, Appellant, Felipe Vazquez, appeals from the August 17, 2021 judgment of sentence entered in the Court of Common Pleas of Westmoreland County at trial court docket number CP-65-CR-0005098-2019 ("5098-CR-2019"), as well as the August 20, 2021 amended judgment of sentence entered in the Court of Common Pleas of Westmoreland County at trial court docket number CP-65-CR-0005102-2019

("5102-CR-2019").[1] A jury convicted Appellant of corruption of minor – defendant age 18 years and above (Count 1) and sexual abuse of a child – child pornography (Counts 2 to 11) at 5098-CR-2019.[2] At 5102-CR-2019, the jury convicted Appellant of statutory sexual assault – complainant under the age of 16, defendant 11 or more years older than complainant (Count 1), unlawful contact with minor (sexual offenses) (Count 2), corruption of minor (sexual offenses) – defendant age 18 years and above (Count 3), and indecent assault – complainant less than 16 years old.[3] The trial court imposed an aggregate sentence of two to four years' incarceration followed by two years' probation. We affirm.

The record demonstrates that, at 5102-CR-2019, Appellant was charged with the aforementioned criminal offenses based on a sexual encounter

_____

[1] The original judgment of sentence docketed at 5102-CR-2019 was entered on August 17, 2021. On August 20, 2021, the trial court amended its August 17, 2017 sentencing order docketed at 5102-CR-2019, vacating a portion of the original sentencing order that amended Count 3 (corruption of minor) of the criminal information from a third-degree felony (18 Pa.C.S.A. § 6301(a)(1)(ii)) to a first-degree misdemeanor (18 Pa.C.S.A. § 6301(a)(1)(i)). **Compare** Sentencing Order, 8/20/21, **with** Sentencing Order, 8/17/21. The amended sentencing order docketed at 5102-CR-2019 on August 20, 2021, now accurately reflects that, at Count 3, Appellant was convicted of, and sentenced for, corruption of minor – defendant age 18 years and above, a third-degree felony, pursuant to 18 Pa.C.S.A. § 6301(a)(1)(ii).

[2] 18 Pa.C.S.A. §§ 6301(a)(1)(i) and 6312(d), respectively. Appellant was found not guilty of unlawful contact with minor (sexual offenses) (Counts 12 to 21), 18 Pa.C.S.A. § 6318(a)(1).

[3] 18 Pa.C.S.A. §§ 3122.1(b), 6318(a)(1), 6301(a)(1)(ii), and 3126(a)(8), respectively.

Appellant had on August 21, 2017 with a then-thirteen-year-old female victim in Westmoreland County, Pennsylvania.[4] Appellant's criminal charges at 5098-CR-2019 stemmed from improper electronic communications Appellant had with the victim following the August 21, 2017 sexual encounter and while Appellant was located in Allegheny County, Pennsylvania.[5]

On June 25, 2020, Appellant filed an *omnibus* pre-trial motion, seeking to, *inter alia*, suppress statements he made to the Pennsylvania State Police ("PSP") and the Florida Department of Law Enforcement ("FDLE")[6] on September 17, 2019, on the grounds that, *inter alia*, Appellant did not receive **Miranda**[7] warnings prior to interrogation. *Omnibus* Motion, 6/25/20, at § IV. At the July 9, 2020 hearing on Appellant's *omnibus* motion, the trial court permitted Appellant to orally amend his *omnibus* motion to include a challenge to a September 6, 2019 traffic stop. N.T., 7/9/20, at 4-6. As amended, Appellant's *omnibus* motion asserted that the traffic stop was pretextual,

---

[4] At the time of this encounter, Appellant was 26 years old and a relief pitcher for the Pittsburgh Pirates, a professional baseball team based in Pittsburgh, Pennsylvania.

[5] For purposes of trial, the two criminal cases were consolidated.

[6] The FDLE began investigating Appellant after the victim and her mother, both of whom were then residing in Florida, reported the sexual encounter and communications by Appellant to Florida law enforcement. Once the FDLE learned that the sexual encounter and some of the communications between Appellant and the victim occurred in Pennsylvania, the PSP were notified of the allegations and the PSP began investigating the allegations.

[7] **Miranda v. Arizona**, 384 U.S. 436 (1966).

without justification to stop Appellant's vehicle, for the purpose of obtaining his local address in Pittsburgh, as well as his cellular telephone number, in violation of his constitutional rights. *Id.* An evidentiary hearing on Appellant's amended *omnibus* motion was conducted on July 9, 2020, and September 1, 2020. On January 14, 2021, the trial court denied Appellant's amended *omnibus* motion.

A jury trial was conducted on May 17, 2021, through May 20, 2021. On May 20, 2021, the jury found Appellant guilty of the aforementioned criminal offenses. On August 17, 2021, the trial court sentenced Appellant to an aggregate sentence of two to four years' incarceration followed by two years' probation.[8] The trial court designated Appellant as a Tier III sex offender pursuant to Section 9799.14(d)(4) of the Sexual Offenders Registration and Notification Act ("SORNA")[9] because he was convicted of statutory sexual

---

[8] At 5102-CR-2019, Appellant received two to four years' incarceration at Count 1, two to four years' incarceration at Count 2, one to two years' incarceration at Count 3, and three to six months' incarceration at Count 4. The sentences imposed for his convictions at Counts 2, 3, and 4 were set to run concurrently to the sentence imposed for his conviction at Count 1.

At 5098-CR-2019, Appellant received three to six months' incarceration for his conviction at Count 1 with the sentence to run concurrently to the sentence imposed at 5102-CR-2019. At Count 2 of 5098-CR-2019, Appellant received two years' probation set to run consecutively to the sentence imposed at 5102-CR-2019. At Counts 3 through 11 of 5098-CR-2019, Appellant received two years' probation at each count with each sentence set to run consecutively to the sentence imposed at Count 1 at 5098-CR-2019 and concurrently to the sentence imposed at Count 2 at 5098-CR-2019.

[9] 42 Pa.C.S.A. §§ 9799.10 to 9799.42.

assault. Appellant was ordered to comply with all SORNA registration requirements. Appellant was also ordered to pay restitution in the amount of $2,422.74, as well as the cost of prosecution. Finally, Appellant was ordered to have no contact with minors (except his own children), as well as the victim and her family. Appellant did not file a post-sentence motion.

On September 13, 2021, Appellant filed a notice of appeal. The trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant filed on November 5, 2021.[10] The trial court filed its Rule 1925(a) opinion on January 4, 2022.[11]

Appellant raises the following issues for our review:

[1.] As a traffic stop was impermissibly prolonged to gather information necessary for the criminal investigation of Appellant and he was subsequently subjected to searches and custodial interrogations without being informed of **Miranda** warnings, was it error for the [trial] court to deny his suppression motions?

[2.] Was it prejudicial error to compel a black criminal defendant to unwillingly engage in a humiliating cross-gender performance of a woman's sexy walk before an all[-]white jury?

_____

[10] Pursuant to agreement of the parties, the trial court extended the time in which to file a Rule 1925(b) statement to November 5, 2021. Trial Court Order, 9/29/21.

[11] We note that the copy of the Rule 1925(a) opinion that is part of the 5098-CR-2019 certified record is missing pages 50 through 73 of the opinion. Those missing pages of the 5098-CR-2019 Rule 1925(a) opinion appear to have been mistakenly interspersed in the pages of the trial court's Rule 1925(a) opinion that is part of the 5102-CR-2019 certified record.

[3.]    Where there was overwhelming uncontroverted evidence that [the victim], a minor female, lied about her age, was considered to be older by others, produced sexually explicit [photographs] and videos of herself that appeared to portray an adult[,] and the primary defense was mistake of age, was there sufficient evidence to support the guilty verdicts?

[4.]    Where there was overwhelming uncontroverted evidence that [the victim], a minor female, lied about her age, was considered to be older by others, produced sexually explicit [photographs] and videos of herself that appeared to portray an adult[,] and the primary defense was mistake of age, were the guilty verdicts against the weight of the evidence?

Appellant's Brief at 3-4 (extraneous capitalization omitted).[12]

**Issue 1 – *Omnibus* Motion**

In his first issue, Appellant challenges the trial court's denial of his amended *omnibus* motion that sought to suppress information Appellant provided during a traffic stop on September 6, 2019, as well as statements Appellant made to law enforcement on September 17, 2019, and items obtained through a subsequent search that same day of Appellant's residence pursuant to a warrant.  Appellant's Brief at 41-53.

An appellate court's standard and scope of review of a challenge to the denial of a suppression motion is well-settled.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  [When] the

_____

[12] For purpose of disposition, we renumbered Appellant's issues.

Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the [suppression] court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [suppression] court are subject to plenary review.

**Commonwealth v. Hoppert**, 39 A.3d 358, 361-[3]62 (Pa. Super. 2012)[, *appeal denied*, 57 A.3d 68 (Pa. 2012)].

Moreover, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." **Commonwealth v. Stilo**, 138 A.3d 33, 35-36 (Pa. Super. 2016)[.]

**Commonwealth v. Wright**, 224 A.3d 1104, 1108 (Pa. Super. 2019) (original brackets and ellipsis omitted), *appeal denied*, 237 A.3d 393 (Pa. 2020).

### A. Traffic Stop

Here, Appellant concedes the "only legitimate reason" for initiating a traffic stop of his vehicle on September 6, 2019, was that PSP Trooper Glenn Adams ("Trooper Adams") observed Appellant failing to use a traffic signal

before initiating a turn of his vehicle in violation of the Motor Vehicle Code.[13, 14]

Appellant's Brief at 44-45. Appellant further concedes that Trooper Adams' request of Appellant to produce this driver's license and vehicle registration, as well as Trooper Adams' verification of those documents, was constitutionally permissible as part of the lawful traffic stop. *Id.* Appellant asserts, however, that upon returning the driver's license and vehicle registration to Appellant, a permissible "seizure" of Appellant for purpose of Fourth Amendment constitutional protections ended because Trooper Adams did not issue Appellant a traffic citation or provide him with a written warning

_____

[13] On September 6, 2019, Trooper Adams was employed as a trooper with the patrol division of the PSP and assigned to the Greensburg, Westmoreland County, Pennsylvania barracks. N.T., 7/9/20, at 3.

[14] Section 3334 of the Motor Vehicle Code states, in pertinent part, as follows:

### § 3334. Turning movements and required signals

**(a) General rule.** - Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made with reasonable safety nor without giving an appropriate signal in the manner provided in this section.

**(b) Signals on turning and starting.** - At speeds of less than 35 miles per hour, an appropriate signal of intention to turn right or left shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning. The signal shall be given during not less than the last 300 feet at speeds in excess of 35 miles per hour. The signal shall also be given prior to entry of the vehicle into the traffic stream from a parked position.

75 Pa.C.S.A. § 3334(a) and (b).

of the traffic offense. *Id.* at 46. Appellant contends, Trooper Adams "impermissibly continued [Appellant's] seizure [by questioning Appellant] about his local domicile and personal telephone number." *Id.* Appellant argues that the information regarding his local address and telephone number was "not necessary to complete the mission of issuing a [citation] for the [traffic] violation" and, therefore, the questions soliciting this information violated his constitutional rights. *Id.* at 46-47. Appellant asserts that "[b]y restricting [Appellant's] liberty and freedom of movement for any length of time beyond that which was required to check his [driver's license and vehicle registration] and prepare a [citation,] no matter how briefly, [Trooper] Adams violated [Appellant's] fundamental right not to be subjected to an unreasonable search and seizure." *Id.* at 47.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 8, of the Pennsylvania Constitution protect individuals from unlawful searches and seizures.[15] It is well-established that "[a] vehicle stop

_____

[15] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Pennsylvania Constitution provides,

constitutes a seizure under the Fourth Amendment." ***Commonwealth v. Chase***, 960 A.2d 108, 113 (Pa. 2008), *citing* ***Whren v. United States***, 517 U.S. 806, 809-810 (1996). "Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense." ***Commonwealth v. Harris***, 176 A.3d 1009, 1019 (Pa. Super. 2017) (stating, "[t]he Fourth Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense"), *citing*, ***Chase***, 960 A.2d at 113. "[A]ny violation of the Motor Vehicle Code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime." ***Harris***, 176 A.3d at 1020.

The United States Supreme Court has explained,

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" - to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are - or reasonably should have been - completed.

_____

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. art. I, § 8.

[W]e concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. [A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. . . . The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. [A police] officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. [The police officer, however,] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic [citation, a police] officer's mission includes ordinary inquiries incident to the traffic stop. Typically[,] such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez v. United States*, 575 U.S. 348, 354-355 (2015) (citations, original brackets, and some quotation marks omitted); *see also Commonwealth v. Malloy*, 257 A.3d 142, 149-150 (Pa. Super. 2021) (stating, "within the context of a lawful traffic stop, [']mission related['] inquiries addressed to the traffic violations which originally prompted the detention [are permitted], as well as incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway").

Thus, in sum, even if a traffic stop is a pretext for an investigation of another unrelated crime, the traffic stop is lawful provided (1) a police officer observes a violation of the Motor Vehicle Code, even if a minor offense, and (2) the traffic stop lasts no longer than is necessary to effectuate the "mission" of the traffic stop, which is to address the Motor Vehicle Code violation and

attend to related safety concerns.  ***See Whren***, 517 U.S. at 813 (stating, a police officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

Here, the trial court summarized the evidence presented at the suppression hearing as follows:

> The Commonwealth's first witness was Trooper Adams.  He testified that on September 6, [2019], he was on duty at the Greensburg barracks of the [PSP] when he was asked to engage in a surveillance detail.  He was asked to assist a team of law enforcement officers, headed by [PSP] Trooper Michael Thompson [("Trooper Thompson")], in ascertaining the residential address of [Appellant], whom he knew to play for the Pittsburgh Pirates.  He knew that the investigation related to alleged sexual contact that [Appellant] had with a minor, but he did not know many details.  His goal was to follow [Appellant] home from a Pirate [baseball] game to see where he lived.  If [Appellant] were to commit a traffic violation, his plan was to pull him over.
>
> According to [Trooper] Adams, [Appellant] left PNC Park,[16] between] 11:30 [p.m. and] 11:35 [p.m.], driving a 2019 Dodge Challenger Hellcat.  Trooper Adams followed him in his unmarked [vehicle], which was equipped with only lights, sirens, and a radio, but not a motor vehicle recorder (["]MVR["]).  Although [Trooper] Adams did not have radar equipment, he observed [Appellant] traveling at "an excessive rate of speed between traffic lights and through [heavy] traffic[.]"  As [Appellant] was traveling on Fort Duquesne Boulevard, [Trooper] Adams noted that [Appellant's vehicle] had a dealer license plate[.]  According to [Trooper] Adams, [Appellant] failed to use his turn signal when making a right turn onto 11th Street or a left turn onto Smallman Street.  As a result, [Trooper Adams] stopped [Appellant] at 11:55 [p.m.] in a parking lot [that was one] mile from PNC Park.

---

[16] PNC Park is a baseball stadium in Pittsburgh where the Pittsburgh Pirates play home games.

[Trooper] Adams testified that given the violations, he had authority to issue a traffic citation or mail [Appellant] a written warning. [Trooper Adams] asked [Appellant] from where he was coming, and he told [Appellant] that he [] stopped him for reckless driving and failure to use his turn signals. [Appellant] provided [Trooper] Adams with his Florida driver's license and the dealer registration [for the vehicle], neither of which contained a local [residence] address [for Appellant. Trooper] Adams testified that he then asked [Appellant] for his local address and [telephone] number because he was going to issue a warning and might need to "contact [Appellant] or provide him with [] paperwork."[FN1] [Trooper] Adams testified that they had a cordial and polite conversation and that [Appellant] expressed support for law enforcement and the difficult job [law enforcement officers] have.

> [Footnote 1 Trooper] Adams denied that he was asked to obtain [Appellant's] telephone number when he was asked to perform the surveillance detail.

On September 7, 2019, Trooper Adams contacted Trooper Thompson and provided him with [Appellant's] local address. [Trooper] Adams never issued a citation or a written warning to [Appellant].

[Appellant] was called to testify [at the suppression hearing] on September 1, 2020. He advised that on September 6, 2019, he was living in the Strip District section in the City of Pittsburgh. He had [] a home [baseball] game that night, which ended at approximately 10:30 [p.m.] He showered and left the [ballpark] afterwards. Before the game, he [] parked [his vehicle], which was owned by a dealer, in the players' parking garage and, upon leaving [the parking garage], turned onto General Robinson Street. He said that traffic was bumper-to-bumper, and numerous fans were milling about on the street and sidewalk. [Appellant stated he] committed no Vehicle Code violations and [] proceeded only 60-70 yards when he stopped in response to police lights in his rearview mirror. Contrary to Trooper Adams' testimony, he stated that he was pulled over just before 11:00 [p.m.]

According to [Appellant, Trooper] Adams was wearing a uniform. His badge, gun, and handcuffs were visible. [Trooper Adams] approached [Appellant] and asked if he could see his driver's license and [vehicle] registration. [Appellant] showed [Trooper Adams] both documents, and [Trooper Adams] asked him for his [local] address and [tele]phone number "for future references."

[Appellant did not] understand why [Trooper Adams] would need the [telephone] number given that he [] told [Trooper] Adams he was a member of the [Pittsburgh] Pirates [baseball team] and would be easy to locate, but he provided the information because he was afraid of the police. He denied that [Trooper] Adams ever gave him a justification for stopping him.

Trial Court Opinion, 1/20/21, at 3-5 (extraneous capitalization omitted).

In denying Appellant's amended *omnibus* motion related to the September 6, 2019 traffic stop, the trial court found that Trooper Adams, having observed Appellant failing to use a turn signal while negotiating turns with his vehicle, had probable cause to conduct a traffic stop of Appellant's vehicle. *Id.* at 22, 26. The trial court further found that, while conducting a traffic stop of this nature, Trooper Adams' questions regarding Appellant's local address and his telephone number were "ordinary inquiries" made by police officers because this information could be used for mailing a citation or written warning or contacting the driver. *Id.* at 24, 26. In so finding, the trial court deemed Appellant's testimony not to be credible, noting, in particular,

[a]s an example, [Appellant] testified that Trooper Adams stopped him for no stated reason only 60 or 70 feet from the parking [garage] next to PNC Park on September 6, 2019. However, he never specified where [Trooper Adams] stopped him, and it is difficult to envision a location on General Robinson Street where this kind of stop could have occurred. It is also difficult to imagine that Trooper Adams, who testified that the stop actually occurred in a quieter area, [] a mile away, would have lied about this given the possibility that the numerous fans [leaving PNC Park after the baseball game concluded] could have videotaped an encounter between the police and a [Pittsburgh] Pirate [baseball] player. Certainly, there are various business establishments in that area that could have been equipped with surveillance cameras. If Trooper Adams were caught in this kind of a lie, it would likely have dire consequences for his career.

- 14 -

*Id.* at 19.

At the suppression hearing, Trooper Adams testified that, on September 6, 2019, he was involved in an undercover surveillance operation to obtain Appellant's residential address in the City of Pittsburgh. N.T., 7/9/20, at 14. While following Appellant's vehicle after Appellant left the players' parking garage at PNC Park, Trooper Adams observed Appellant failing to use a turn signal when he turned his vehicle right onto Fort Duquesne Boulevard and again when Appellant turned his vehicle left onto Smallman Street. *Id.* at 15-17. After the second instance of observing a Vehicle Code violation for failing to use a turn signal, Trooper Adams initiated a traffic stop of Appellant's vehicle. *Id.* at 17. Trooper Adams explained that with a traffic stop of this nature, a police officer, at the conclusion of the traffic stop, can issue a verbal warning directly to the driver, provide the driver with a written warning or mail the same to the driver on a future date, or provide the driver with a written citation or file the same within 10 days. *Id.* at 18. Because Trooper Adams was using an unmarked police vehicle as part of the undercover surveillance operation, providing Appellant a written warning or citation that evening was not an option because his unmarked police vehicle was not equipped with the necessary computer equipment used to generate a written warning or citation. *Id.* at 33-42.

After approaching Appellant's stopped vehicle, Trooper Adams asked Appellant where he was coming from and advised him of the reason for the traffic stop. *Id.* at 20. Appellant provided Trooper Adams with his Florida

driver's license and the vehicle's registration card. *Id.* at 19. Trooper Adams returned to his unmarked police vehicle with these documents to conduct a review.[17] *Id.* at 21. After verifying the information provided by Appellant, Trooper Adams returned to Appellant's vehicle and asked Appellant for his local address and telephone number. *Id.* When asked if he indicated to Appellant the purpose of obtaining this information, Trooper Adams responded, "Yes. Just that with him being an out-of-state resident[,] if we would need to contact him or provide him with any paperwork we would need to send it directly to him." *Id.* Trooper Adams further explained that it was desirable to have a local address rather than an out-of-state address for a driver. *Id.* at 19-20. Trooper Adams knew that as a baseball player for the Pittsburgh Pirates, Appellant would have a local address where he resided while in the Pittsburgh area. *Id.* at 19. After Appellant provided Trooper Adams with his local address and telephone number, Trooper Adams advised Appellant that he would issue him a verbal warning, at this time, for his violation of the Motor Vehicle Code. Trooper Adams then returned the driver's license and vehicle registration card to Appellant, thereby, concluding the traffic stop.

---

[17] Trooper Adams presumably used radio communication with another police officer to conduct a review of Appellant's driver's license and vehicle registration information because the unmarked police vehicle he was using that evening was not equipped with an on-board computer system, which would have permitted Trooper Adams to conduct the verification of information himself.

Based upon our review of the record, we concur with the trial court, and the record supports, that Trooper Adams obtained Appellant's local address and telephone number while engaged in the "mission" of addressing the observed Motor Vehicle Code violation that warranted the traffic stop. During the series of events that unfolded after Trooper Adams stopped Appellant's vehicle for the traffic violation, Trooper Adams informed Appellant of the reason for the stop, obtained Appellant's driver's license and vehicle registration card, conducted a review of the same, noting the out-of-state address on the driver's license, obtained a local address and telephone number for purpose of contacting Appellant regarding the traffic stop, if necessary, issued a verbal warning to Appellant for the Motor Vehicle Code violation, and returned Appellant's driver's license and vehicle registration card to him. Trooper Adams' act of obtaining Appellant's local address and telephone number did not unreasonably prolong the traffic stop and was conducted within the framework of the traffic stop's mission. Therefore, we discern no error of law or abuse of discretion in the trial court's denial of Appellant's amended *omnibus* motion on this ground.[18]

**B. September 2019 Police Encounters**

---

[18] Trooper Adams' subjective intent of obtaining knowledge of Appellant's local address that evening is of no consequence to our analysis because Trooper Adams had probable cause to stop Appellant's vehicle for an observed traffic violation, and the information was provided by Appellant during the traffic stop's mission without undue extension of the traffic stop.

Concerning police questioning of Appellant on September 17, 2019, Appellant asserts that neither the PSP officers nor the FDLE officers *Mirandized* Appellant prior to interrogating him about the events involving the minor victim.[19] Appellant's Brief at 47-52. Appellant asserts that his involvement with Trooper Thompson and Trooper Yeager on September 17, 2019, amounted to a custodial interrogation and, as such, required him to be advised of his *Miranda* rights, which did not occur prior to the police officers' interrogation.[20] *Id.* at 51. Appellant contends that the trial court failed to consider, *inter alia*, Appellant's immigrant roots, education, understanding of

_____

[19] As discussed more fully *infra*, on September 17, 2019, Appellant was questioned at his Pittsburgh residence by Trooper Thompson and PSP Trooper Brandon Yeager ("Trooper Yeager"). Later that same day, and separate from the interview conducted by Trooper Thompson and Trooper Yeager, FDLE Special Agent Orlando Esquibel ("Agent Esquibel") and FDLE Special Agent Christopher Tissot ("Agent Tissot") questioned Appellant and subsequently arrested Appellant pursuant to a Florida-issued arrest warrant. PSP Trooper Jeff Tagmyer ("Trooper Tagmyer") was also present at this time as local law enforcement for the purpose of assisting Agent Esquibel and Agent Tissot in the execution of the arrest warrant.

[20] Appellant argues that Trooper Thompson's statement - "We didn't want to give the appearance that [Appellant] was in police custody" - implicitly evidences that he was in police custody and that *Miranda* warnings were necessary before the PSP officers questioned him. Appellant's Brief at 49. In so arguing, Appellant references a statement Trooper Thompson made while testifying at Appellant's trial. *See* N.T., 5/18/21, at 173. It is well-settled that "[w]hen reviewing the denial of a suppression motion, [an appellate court] reviews only the suppression hearing record, and not the evidence elicited at trial." *Commonwealth v. Frein*, 206 A.3d 1049, 1064 (Pa. 2019), *cert. denied*, 140 S.Ct. 844 (2020). Because Trooper Thompson's testimony was elicited at trial, we may not consider it in reviewing the denial of Appellant's *omnibus* motion.

the English language, fear of law enforcement, and his placement at the time of the questioning when the trial court conducted its totality of the circumstances analysis and concluded Appellant's interaction with Trooper Thompson and Trooper Yeager did not give rise to a custodial interrogation requiring *Miranda* warnings. *Id.* at 50-51.

Our law is well-settled that,

> before law enforcement officers question an individual who has been [] taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he[, or she,] has the right to remain silent, that anything he[, or she,] says can be used against him[, or her,] in a court of law, that he[, or she,] has the right to the presence of an attorney, and that if he[, or she,] cannot afford an attorney one will be appointed.

*Commonwealth Yandamuri*, 159 A.3d 503, 519-520 (Pa. 2017), *citing Miranda*, 384 U.S. at 478-479. Simply stated, an individual is entitled to *Miranda* warnings prior to custodial police interrogation. *Commonwealth v. Witmayer*, 144 A.3d 939, 948 (Pa. Super. 2016), *appeal denied*, 169 A.3d 27 (Pa. 2017). Two issues emerge here. First, we must determine whether the individual has been interrogated. Next, we need to ascertain whether the individual was in custody when the interrogation occurred.

Regarding Appellant's interaction with Trooper Thompson and Trooper Yeager, we concur with the trial court, and the Commonwealth concedes, that Appellant was subjected to police interrogation. Trial Court Opinion, 1/20/21, at 27 (stating, "there is no question that [Appellant] was interrogated by the police"); *see also* Commonwealth Brief at 43 (stating, "the question for the

- 19 -

suppression court was limited to a determination of whether [Appellant] was 'in custody' so as to trigger" the need for *Miranda* warnings). Thus, our inquiry is limited to determining whether the trial court erred in denying Appellant's amended *omnibus* motion on the basis that Appellant was not "in custody" at the time of his interaction with Trooper Thompson and Trooper Yeager.

Our Supreme Court has explained that *Miranda* warnings "are required only where a suspect is both taken into custody and subjected to interrogation." *Yandamuri*, 159 A.3d at 520.

> In determining whether a suspect is in custody, two discrete inquiries are essential: (1) an examination of the circumstances surrounding the interrogation; and (2) a determination of whether, given those circumstances, would a reasonable person have felt that he or she was at liberty to terminate the interrogation and leave. [A] person is in custody for *Miranda* purposes only when he[, or she,] is physically denied his[, or her,] freedom of action in any significant way or is placed in a situation in which he[, or she,] reasonably believes that his[, or her,] freedom of action or movement is restricted by the interrogation. Statements not made in response to custodial interrogation are classified as gratuitous and not subject to suppression for lack of *Miranda* warnings. Whether an encounter is deemed "custodial" must be determined by examining the totality of the circumstances.

*Yandamuri*, 159 A.3d at 520 (citations omitted). "The standard for determining whether an encounter is custodial is an objective one, focusing on the totality of the circumstances with due consideration given to the reasonable impression conveyed to the individual being questioned." *Commonwealth v. Cooley*, 118 A.3d 370, 376 (Pa. 2015).

In determining whether an interrogation by law enforcement amounts to a custodial interrogation, under the totality of the circumstances, courts should consider the following factors: "the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." **Witmayer**, 144 A.3d at 949, *citing* **Commonwealth v. Baker**, 963 A.2d 495, 501 (Pa. Super. 2008), *appeal denied*, 992 A.2d 885 (Pa. 2010). An additional factor for the courts to consider is whether the individual was released at the end of the questioning by law enforcement. **Howes v. Fields**, 565 U.S. 499, 509 (2012).

In denying Appellant's amended *omnibus* motion as it relates to statements Appellant made during his interrogation by Trooper Thompson and Trooper Yeager, the trial court summarized its factual findings as follows:

> During the early part of September 2019, [Trooper] Thompson put together search warrants for [Appellant's] residence, [cellular telephone, certain areas of] PNC Park, and various vehicles. Those warrants[, upon issuance,] were . . . executed on September 17, 2019. Prior to executing those warrants, however, Trooper Thompson wanted to interview [Appellant] at his residence.
>
> At 7:00 [a.m.,] on September 17, 2019, Trooper Thompson met with a team of law enforcement officers on Smallman Street in Pittsburgh to coordinate issues relating to [two] search teams. The teams were going to search [Appellant's] residence, [the baseball team's locker room at] PNC Park, and two [] of [Appellant's] vehicles. [Agent] Esquibel and [Agent] Tissot were present for that meeting. [Trooper] Thompson was advised that Agent Esquibel had a warrant for [Appellant's] arrest from the State of Florida. [Trooper] Thompson, on the other hand, had no

plans to arrest [Appellant] that day. On September 17, 2019, at 7:40 [a.m., Trooper] Thompson arrived at [Appellant's residence] along with [] Trooper [] Yeager. . . . Both [police] officers were out of uniform, wearing suits. [Trooper] Thompson had [an] identification [card identifying that he was] a [PSP] trooper around his neck and [he] wore his badge on his hip. [Trooper] Thompson knocked on [Appellant's] door, and [Appellant] partially opened [the door. Trooper] Thompson introduced himself, told [Appellant he and Trooper Yeager] wanted to speak to him about a private investigation, and asked if they could come in. [Appellant], who was wearing boxer briefs, opened the door and allowed them [to enter. Appellant] led them into the kitchen area as the front door closed behind them. On the way to the kitchen, [Appellant] put on jeans that he retrieved from a suitcase. The [police officers] smelled burnt marijuana in the [residence] when they entered but never brought that issue up with [Appellant]. Although Trooper Thompson [possessed a warrant to search the residence], he did not advise [Appellant] of this prior to the interview[.]

The police [officers] conducted the interview in the kitchen, with all three individuals standing throughout [the interview]. For the most part, [Appellant stood] on one side of a kitchen island while the [police officers stood] on the other side [of the kitchen island and] closer to the entrance door. The exception to this [positioning of the police officers] was when [Appellant] showed them images on a laptop [computer] and they walked over to his side of the [kitchen] island.

[Trooper] Thompson denied having ever restricted [Appellant's] movements during the interview. [Appellant] left their sight on at least two occasions during the interview to enter his bedroom, and the [police officers] never objected to this. On one of these occasions, [Appellant] was wearing what appeared to be a bracelet when he left the [kitchen area] but was no longer wearing it when he reappeared. [Trooper] Thompson asked him about this, and [Appellant] told him that it was a hair tie as opposed to a bracelet and that he was now wearing it in his hair. [Trooper] Thompson stated that he and [Trooper] Yeager were polite to [Appellant], never raised their voices, and never drew their weapons. [Appellant], in turn, was cooperative, polite, and non-threatening with them. [Appellant] never indicated that he wanted to end the interview. In, fact, [Trooper] Thompson testified that [Appellant] joked with the [police officers] on multiple occasions. [Trooper] Thompson felt that [Appellant's use

of the English language] was "proficient," and he never thought of consulting an interpreter.

Trooper Thompson first obtained [Appellant's] name, date of birth, and telephone number. He advised [Appellant] that he was investigating an alleged sexual relationship between [Appellant] and a minor child, and [Trooper Thompson] showed [Appellant] a photo of [the victim. Appellant] never denied knowing the [] victim. At the beginning of the interview, [Appellant] denied that [he and the victim were involved in] an illicit relationship, but by the end of the interview, he [] admitted [to their sexual relationship. Appellant] also advised that his cell[ular tele]phone was linked with his laptop [computer]. At that point, early in the interview, he went into the bedroom, retrieved the laptop [computer], and showed [the police officers] multiple photo[graphs] and sexual videos of the victim, whom [Trooper] Thompson had previously met. Although [Trooper] Thompson knew then that [Appellant] was in possession of child pornography, he did not arrest [Appellant] or restrict his movement because he wanted to continue the interview. He further asked [Appellant] for the pass codes [used to access] his cell[ular tele]phone and the laptop [computer], and [Appellant] provided them. The interview ultimately ended when [Appellant] allegedly admitted to having a sexual relationship with the [victim].

At the end of the interview, at 8:30 [a.m., Trooper] Thompson advised [Appellant] that he had a search warrant. He showed [Appellant] the warrant and some photo[graphs] that he [] extracted from the victim's [cellular telephone. Trooper Thompson] told [Appellant] that he was looking for [certain] items, such as [items of Appellant's] clothing[] that appeared in those photo[graphs. Trooper] Thompson then contacted other [police] officers, who were outside the [residence], told them he was done with the interview process, and asked them to [proceed to] the [residence] to help with the search. [Appellant] remained in the kitchen. At one point, [Trooper] Thompson showed [Appellant] a photo[graph] of a [] belt, and [Appellant] retrieved [the clothing item.] Before [Appellant] handed [Trooper Thompson] the belt, [Trooper] Thompson told him to stop because the items were to be photographed as they were [discovered. Appellant] complied with the request and dropped the belt at the threshold of his bedroom. At another point, the police [officers] found the marijuana [Trooper] Thompson [] smelled earlier. [Appellant] said it was his and jokingly asked the [police] officers

to leave it there. The police seized his cell[ular tele]phone, laptop [computer], and car keys among other items.

At the end of the search, at 10:30 [a.m., Trooper] Thompson, [Trooper] Yeager, and the other [police] officers who had searched the apartment left together. They [] caused no damage to the apartment. [Appellant] remained alone in the apartment, unrestrained, [after] the [police] officers left. Before leaving, [Trooper] Thompson told [Appellant] that Florida investigators would be contacting him to talk to him. [Trooper] Thompson never read [Appellant] his **Miranda** warnings. [Appellant] never asked to contact an attorney. [Trooper] Thompson could not recall if [Appellant's] car keys had been returned to [Appellant] at that point.

[Appellant's version of the events] was much different from that of [Trooper] Thompson. [On September 17, 2019, at] 7:40 [a.m., Appellant] heard banging on his door which was so loud "it was like somebody wanted to break the door open and come in." He "jumped" out of bed, came to the door, looked through the peephole, and saw two males carrying police identification. Both [men] carried firearms and handcuffs. [Appellant] was afraid and tried to hide his [] marijuana. He then came to the door in his boxer shorts and cracked the door open. He asked the police [officers] if he could help them. They said, in angry tones, that they needed to talk to him. He said, "let's talk." They told him they needed to talk inside, and they forced their way in.

According to [Appellant, Trooper] Thompson entered the kitchen, followed by [Trooper] Yeager. [Appellant] entered the kitchen, and the [police] officers positioned themselves in such a way that [Appellant's] access to the entryway[,] the bathroom[,] and [the] bedroom [was] blocked. [The police officers] told him their names and showed him a photo[graph] of the [] victim. In a "demanding" tone, they told [Appellant] that they wanted to ask him about his interactions with [the victim]. One of the [police] officers told [Appellant] that they already knew what happened but needed to hear his version. [Appellant was holding his cellular telephone] and indicated that he needed to speak to the [baseball] team's lawyer, but the [police officers] told him to "put the f[*****]g phone down" - that he wouldn't be calling anyone. They told him that agents from the FDLE were downstairs and wanted to arrest him, and they suggested that he speak to them first.

Two to four minutes after [Trooper] Thompson and [Trooper] Yeager entered, a male and a female entered [Appellant's residence] and began searching his bedroom. [These two individuals] never knocked, asked to enter, or showed him a [search] warrant. Two to four minutes after they entered, another two [police] officers came in and began searching his bathroom. [Appellant] was never told they had a search warrant until immediately before the [police] officers left.

At some point during the questioning by [Trooper] Thompson and [Trooper] Yeager, [Appellant's] car keys were on the kitchen island. [The police officers] told [Appellant] to give the keys to them, and he complied. On six or seven occasions, [the police officers] asked him what happened [with the victim], and he stated that he needed to call the [baseball] team's lawyers. He was denied [the opportunity to contact an attorney] in a harsh tone on each occasion. When he asked to go to the bathroom, he was followed [] by Trooper Yeager. When he picked up his [cellular tele]phone to try to call the [baseball] team lawyers, [Trooper] Yeager again told him to "put the f[*****]g phone down." [Appellant] used a beaded bracelet to put his hair into a "man bun" when he was in the bathroom, but when he returned, [Trooper] Thompson accused him of [hiding] the bracelet. [Trooper Thompson] told [Appellant] to give him the bracelet. He complied. Then [Trooper] Yeager told [Trooper] Thompson about the attempted [telephone] call in the bathroom. [Trooper] Thompson demanded that [Appellant] give him the [cellular tele]phone, and he did. [Trooper] Thompson told him to "go put some f[*****]g clothes on." [Appellant] put on pants and [Trooper] Thompson directed him to sit [on] a specific stool in the kitchen - away from his [car] keys and his [cellular tele]phone. At that point, he gave up trying to avoid talking and adopted a friendly joking manner to avoid escalation. At that point, he began showing [the police officers] images of the victim from his computer. The [police] officers never advised him of his [*Miranda*] rights, and he felt that he was in custody throughout the ordeal. Eventually, [Trooper] Thompson, [Trooper] Yeager, and the other individuals searching the [residence] left together.

Trial Court Opinion, 1/20/21, at 6-11 (record citations omitted).

As discussed *supra*, the trial court found Appellant not to be a credible witness at the suppression hearing. *Id.* at 16-20. As the trial court explained,

Appellant, during his testimony, attempted "to portray himself as an unsophisticated foreigner, deserving of sympathy due to his inability to understand basic concepts" including his "grasp of the English language," how to spell his last name, and an "ability to understand police and legal procedures." *Id.* at 16-17. The trial court found, however, that Appellant "appeared to be quite intelligent and proficient in the English language," generally providing responsive and appropriate answers to questions he was asked by counsel at the suppression hearing. *Id.* at 17-18. The trial court further noted that Appellant regularly signed his name in autographs as a professional baseball player and was "relatively active on social media" using the English language. *Id.* at 17.

Finding Trooper Thompson's testimony regarding the September 17, 2019 interrogation to be credible, the trial court, in denying Appellant's amended *omnibus* motion as it pertained to this event, explained,

> The police [officers] never forced their way into [Appellant's residence]. They knocked and then asked to come in so that they could question [Appellant] about his alleged relationship with the victim. He consented by opening the door and leading them into the kitchen. Much was made of the fact that during questioning, [Appellant] was located on the far side of the kitchen island, and the [police] officers were located on the side closest to the entrance, thereby potentially permitting them to "block" any attempted egress. But the far side of the [kitchen] island is where [Appellant] gravitated upon letting them in. It would have been intimidating if the police [officers] walked to the same side of the [kitchen] island as [Appellant] and questioned him from there. Furthermore, [Appellant] obviously felt comfortable leaving the kitchen despite their presence because he did so twice. They did not follow him. During the 50-minute interview, [Appellant] was never transported against his will. No restraints were used. No

force or threat of force was used. To the contrary, all [of the parties] were polite and cordial, and [Appellant] even joked with the [police] officers. Had the questioning continued after [Appellant] requested an end to it or requested an attorney, the interview might have become custodial, but he never did. [Appellant] was never denied his freedom of action in any significant way or placed in a situation in which he would reasonably believe that his freedom of action or movement might be restricted by the [interrogating officers]. For these reasons, the [trial c]ourt finds that [Appellant] was not in custody when [Trooper Thompson and Trooper Yeager interrogated] him.

*Id.* at 28.

At the suppression hearing, Trooper Thompson testified that both he and Trooper Yeager arrived at Appellant's residence at 7:40 a.m., wearing suits rather than their police uniforms. N.T., 9/1/20, at 6, 33-34. In Trooper Thompson's case, his photo identification was attached to a lanyard around his neck, his police badge was located on his hip in plain sight, his firearm was located on his right hip and was generally covered by his suit jacket, and a pair of handcuffs were located on his left hip.[21] *Id.* at 6, 62. Upon arriving at Appellant's residence, Trooper Thompson knocked on the door and Appellant opened the door partially with only Appellant's head fully visible to the police officers. *Id.* at 6, 69. Trooper Thompson, upon seeing Appellant, introduced himself, informed Appellant that he and Trooper Yeager wanted to speak to him regarding an on-going police investigation, and asked to come

---

[21] Trooper Yeager was outfitted in a similar fashion, according to Trooper Thompson. N.T., 9/1/20, at 6.

into the residence "due to the private nature" of the investigation.[22] *Id.* at 7, 61, 69. As Appellant opened the door fully and let the police officers into the residence, Appellant retrieved pants from a suitcase in the entryway and put them on.[23] *Id.* at 7. Appellant led the police officers to the kitchen area of the residence where Appellant positioned himself on one side of the kitchen island and Trooper Thompson and Trooper Yeager positioned themselves on the other side of the kitchen island with Trooper Yeager closest to the entry door.[24] *Id.* at 8-9.

Initially, Trooper Thompson asked Appellant general questions regarding his name, date of birth, telephone number, and general background information. *Id.* at 72. Afterward, Trooper Thompson informed Appellant that they were "investigating a sexual relationship with a minor that

---

[22] At this time, Trooper Thompson did not inform Appellant that he was the subject of the police investigation. N.T., 9/1/20, at 63.

[23] When Appellant answered the door, he was wearing what was described as "boxer briefs," and Appellant appeared, in Trooper Thompson's opinion, to have been awaken by the knocking. N.T., 9/1/20, at 70, 79, 91-92.

[24] As Trooper Thompson entered the residence, he detected a strong odor of marijuana but did not question Appellant about the suspected use of marijuana, at that time. N.T., 9/1/20, at 11-12, 65. Later, during the execution of a search warrant for Appellant's residence, as discussed *infra*, a suspected substance was discovered that Appellant confirmed was marijuana. *Id.* at 30. Appellant informed Trooper Thompson that he ingested marijuana the prior evening to help him sleep. *Id.* at 91. Based upon his training and experience, Trooper Thompson testified that, during the interrogation, he detected no indication that Appellant was under the influence of marijuana. *Id.* at 90.

[Appellant] was accused of having," and he showed Appellant a photograph of the victim. *Id.* at 12, 72. Trooper Thompson testified that Appellant, at first, denied having an inappropriate relationship and contact with the victim, but later, Appellant admitted to the sexual relationship. *Id.* at 13. Trooper Thompson testified that at no point during the interrogation did he provide Appellant with his *Miranda* warnings. *Id.* at 43, 63-67.

Throughout the interrogation, Trooper Thompson stated that Appellant was free to move about the residence and was not restrained in his movements at any point. *Id.* Trooper Thompson testified that Appellant, in fact, left the sight of the police officers on at least two occasions during the interview, one of these instances being when Appellant retrieved his laptop computer from the bedroom. *Id.* at 10. Trooper Thompson described the interrogation as a "polite, open conversation" in which Appellant was free to move about, to decline answering any question posed, and to ask the police officers to leave the residence at any time, which Appellant never requested. *Id.* at 11. At no point throughout the interrogation did any party raise their voice, and there was never a need for the police officers to draw their weapons. *Id.* Trooper Thompson stated that, throughout the interrogation, Appellant never asked to contact an attorney or contact the baseball team for the purpose of contacting an attorney. *Id.* at 72. In fact, during most of the interrogation, Appellant had his cellular telephone in his hand. *Id.* at 92.

After acknowledging his relationship with the victim, Appellant informed Trooper Thompson that he had photographs and recorded video footage

involving the victim. *Id.* at 14. Appellant first attempted to access the photographs and video footage *via* his cellular telephone but, due to a technical issue, had to retrieve his laptop computer from the adjacent bedroom to show the police officers the photographs and video footage. *Id.* at 14. When Appellant returned to the kitchen island after retrieving his laptop computer, the police officers moved to Appellant's side of the island so they could view the photographs and video footage that Appellant wanted to show them.[25] *Id.* at 17-18. After the police officers reviewed the photographs and video footage, they returned to the opposite side of the kitchen island. *Id.* at 18. Trooper Thompson described Appellant's responses to police inquiries as polite and communicated in a non-threatening manner, with Appellant even joking and laughing during the interrogation. *Id.* at 19-20. The interrogation lasted until 8:30 a.m.

After the interrogation concluded, Trooper Thompson informed Appellant that they had a search warrant for his residence, which included photographs of certain items they needed to locate. *Id.* at 23-24. Trooper Thompson contacted the search team that was located outside Appellant's

---

[25] Although Trooper Thompson knew that it was illegal for Appellant to have the photographs and video footage (child pornography) stored on his laptop computer, Trooper Thompson did not arrest Appellant at this time or restrain his actions in any way. N.T., 9/1/20, at 17.

residence building.[26]  *Id.* at 25.  Appellant complied with the execution of the search warrant, allowing the search team to photograph certain portions of his body, and he even retrieved a belt that the police officers sought to recover.  Trooper Thompson testified that the search warrant was executed at 8:30 a.m. and the search was completed at 10:30 a.m., at which time the police officers, including Trooper Thompson and Trooper Yeager, left Appellant's residence.  *Id.* at 32.  Appellant remained in the residence after the police officers left.[27]  *Id.* at 32.  Prior to vacating the residence, Trooper Thompson informed Appellant that FDLE officers also wanted to speak with him at some point.  *Id.*

Viewing the evidence in the light most favorable to the Commonwealth, as the prevailing party at the suppression hearing, we concur with the trial court, and the record supports, that while Trooper Thompson's questioning of Appellant amounted to interrogation, Appellant was not in custody during the interrogation.  Therefore, no **Miranda** warnings were required.  **Yandamuri**, 159 A.3d at 520.  A review of the totality of the circumstances demonstrates

---

[26] Trooper Thompson testified that the search team did not accompany him and Trooper Yeager when they first arrived at Appellant's residence because he did not want the presence of additional police officers to be intimidating to Appellant.  N.T., 9/1/20, at 25.

[27] Trooper Thompson testified that the purpose of his visit to Appellant's residence that day was to interview Appellant and to execute the search warrant.  Trooper Thompson had no intention of arresting Appellant at his residence on the morning of September 17, 2019, because the police investigation was still in the "evidence collecting mode."  N.T., 9/1/20, at 86-88.

that the interrogation lasted 50 minutes; the interrogation took place in Appellant's residence, where Appellant was free to move about and had access to his cellular telephone much of the time; Appellant allowed the police officers into his residence; no restraints, force, weapons, or threats were used; and at the conclusion of the interrogation, Appellant remained in his residence. Under these circumstances, a reasonable person would feel at liberty to terminate the interrogation at any point by, *inter alia*, asking the police officers to leave the residence or asking to speak to, or contacting, an attorney. Therefore, Appellant was not subject to a custodial interrogation in the case *sub judice.* Consequently, Appellant's challenge to the denial of his amended *omnibus* motion on this basis is without merit.

Regarding the subsequent questioning conducted by Agent Esquibel and Agent Tissot, as well as Trooper Tagmyer, Appellant asserts that, contrary to Trooper Tagmyer's testimony that Appellant was *Mirandized* prior to the police interrogation, he was, in fact, not *Mirandized* at any point during this police questioning. Appellant's Brief at 52. Appellant argues that because the police recording of his interrogation by these police officers does not show that *Miranda* warnings were issued and there is no evidence of a signed *Miranda* rights waiver form, the trial court erred in not granting his suppression motion. *Id.*

The trial court concluded, and the record supports, that questioning by Agent Esquibel and Agent Tissot amounted to a custodial interrogation, requiring the issuance of *Miranda* warnings prior to the start of the

interrogation. Trial Court Opinion, 1/20/21, at 32. Therefore, our review is limited to whether the trial court erred in finding Appellant was advised of, and validly waived, his *Miranda* rights prior to the commencement of the interrogation.

"It is the Commonwealth's burden to establish whether a defendant knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." ***Commonwealth v. Eichinger***, 915 A.2d 1122, 1135-1136 (Pa. 2007) (brackets omitted), *cert. denied*, 552 U.S. 894 (2007). Although the person interrogated must explicitly waive his or her *Miranda* rights, there is no formal protocol for memorializing the waiver. ***Commonwealth v. Clemons***, 200 A.3d 441, 520-522 (Pa. 2019), *cert. denied*, 140 S.Ct. 176 (2019). Waiver may be inferred from the actions and words of the interviewee after he or she has been advised of his or her *Miranda* rights. ***Clemons***, 200 A.3d at 520. A verbal expression of waiver is not required, nor is a written waiver required. ***Id.***; ***see also Commonwealth v. O'Bryant***, 388 A.2d 1059, 1061 (Pa. 1978), *cert. denied*, 439 U.S. 990 (1978). Rather, waiver occurs when there is a sufficient manifestation of an intent to waive one's rights. ***Clemons***, 200 A.3d at 520; ***see also Commonwealth v. Baez***, 21 A.3d 1280, 1286 (Pa. Super. 2011) (holding that, a defendant's indication he or she understood his or her rights and then proceeded to answer questions was sufficient

manifestation of intent to waive his or her rights), *appeal denied*, 37 A.3d

1193 (Pa. 2012).

Here, the trial court summarized its factual findings as follows:

Trooper Tagmyer testified that on September 17, 2019, he was employed [as a PSP trooper assigned to the] Pittsburgh barracks and was asked to assist with a security detail relative to the search of [Appellant's residence.] Teams of investigators [met] earlier [that same day] in the Strip District [section of] Pittsburgh and were assigned to various locations that were to be searched, including [Appellant's] residence, his vehicle or vehicles, and PNC Park. [Trooper] Tagmyer was assigned to [the activities occurring at Appellant's] residence. While he was in the garage underneath [the residence] complex that day, he was asked, approximately 10-15 minutes ahead of time, to assist Florida investigators in arresting [Appellant]. He[, Agent Esquibel, and Agent Tissot] arrived at [Appellant's residence] 10-15 minutes after the PSP [(including Trooper Thompson, as discussed *supra*)] had left. The [FDLE agents], who had arrest warrants [for Appellant], briefly advised [Trooper] Tagmyer that they just needed him to *Mirandize* [Appellant], and they would handle the rest. Each of the three [police] officers wore a uniform, and [Trooper] Tagmyer had [his weapon] holstered. [Trooper] Tagmyer knew that the goal of [Agent] Esquibel and [Agent] Tissot was to obtain a statement from [Appellant] and then to arrest him.

On September 17, [2019,] in the late morning, [Trooper] Tagmyer knocked on [Appellant's] door, introduced himself as a [PSP t]rooper, and provided his name. [Appellant] let the three [police officers] in[to his residence. Appellant] walked into the kitchen, and the three [police officers] followed [him]. When [Trooper] Tagmyer was in the area of the kitchen island, he read [Appellant] the *Miranda* warnings from an "SP 7" form that he carried with him. He did not record the reading of the [*Miranda*] rights in any way or have [Appellant] sign an acknowledgement form afterwards. No one handcuffed or restrained [Appellant] at the time, and [Appellant] appeared to understand the warnings. According to [Trooper] Tagmyer, [Appellant] orally waived his [*Miranda*] rights and agreed to speak to the three [police officers].

Immediately after the [***Miranda***] rights were waived, Agent Esquibel introduced a recording device and recorded an interview with [Appellant. Trooper] Tagmyer was unaware until that point that the interview would be recorded. [Trooper Tagmyer did not participate in the questioning of Appellant.]

The tape of the recorded interview was admitted into evidence. The first statement in that interview was a question from [Appellant] as to whether he would be going to jail that day. [Agent] Esquibel, who directed the interview, indicated that he had warrants for [Appellant's] arrest for soliciting a child for sex and distributing harmful material to a minor, and he asked [Appellant] if it was "okay if we still talk." [Appellant] consented.

Trial Court Opinion, 1/20/21, at 11-12 (record citations and footnote omitted).

The record demonstrates that, on September 17, 2019, Trooper Tagmyer was assigned to security detail as part of the police operation unfolding at Appellant's residence that morning.[28] N.T., 7/9/20, at 44. Shortly before the FDLE engaged Appellant that morning for the purpose of interviewing him and executing the Florida arrest warrants, Trooper Tagmyer was reassigned to assist Agent Esquibel and Agent Tissot because a PSP officer had to take Appellant into custody upon execution of the Florida-issued arrest warrants. ***Id.*** at 44, 72. In addition to taking Appellant into custody, Trooper Tagmyer was asked to ***Mirandize*** Appellant. Trooper Tagmyer did not participate in the questioning of Appellant. ***Id.*** at 74-75.

_____

[28] Trooper Tagmyer explained that "security detail" involved making sure that the news media was kept a safe distance away from the police investigation and that vehicles driving in the area adjacent to Appellant's residence "were taken care of." N.T., 7/9/20, at 74.

Upon approaching the door to Appellant's residence, Trooper Tagmyer testified that he knocked on the door and that Appellant allowed the police officers into his residence after Trooper Tagmyer indicated the police officers wanted to speak with him. *Id.* at 45. Trooper Tagmyer stated that he was in police uniform at the time and that no show of force was used to gain access to Appellant's residence. *Id.* at 46. After introducing himself to Appellant and informing Appellant that the police officers were there to arrest him on a warrant issued by the State of Florida, Trooper Tagmyer read Appellant his *Miranda* rights verbatim from the PSP SP 7 *Mirandizing* form.[29] Trooper Tagmyer testified that, during the reading of the *Miranda* rights, Appellant appeared to be listening and understanding Trooper Tagmyer, and Appellant never expressed "a lack of understanding or concern" about what was being read to him. *Id.* at 47-48. Trooper Tagmyer stated that, upon being read his

---

[29] Trooper Tagmyer testified that the PSP SP 7 form reads as follows:

> My name is Trooper Tagmyer of the Pennsylvania State Police. You have an absolute right to remain silent. Anything you say can and will be used against you in a court of law. You also have a right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning if you so desire. If you decide to answer questions, you may stop at any time you wish, and you cannot be forced to continue.

N.T., 7/9/20, at 49 (form personalized for use by Trooper Tagmyer).

*Miranda* rights, Appellant waived those rights orally and proceeded to answer the questions of Agent Esquibel and Agent Tissot. *Id.* at 48.

In denying Appellant's amended *omnibus* motion on this ground, the trial court found Trooper Tagmyer's testimony – that Appellant understood his *Miranda* rights as they were explained to him and waived those rights – to be credible. Appellant asserts that, "[a] fair reading of the record establishes that no [*Miranda*] rights warning was given" and, therefore, the trial court's finding that *Miranda* rights were provided and validly waived is "inconsistent with other uncontradicted evidence," *i.e.*, Appellant's testimony that he was never informed of his *Miranda* rights. This argument invites us to reassess the credibility of the evidence. We decline Appellant's invitation. Our role, here, is to view the record in the light most favorable to the Commonwealth, as the prevailing party at the suppression hearing, and assess whether the trial court's findings are supported by the record and are free of legal errors. In so doing, we concur with the trial court, and the record supports, that Trooper Tagmyer informed Appellant of his *Miranda* rights, verbally, and that Appellant waived those rights. A written confirmation of Appellant's waiver, or a recording of the same, although advisable in interrogations, such as the interrogation in the case *sub judice*, are not mandated in order to find waiver of those rights.[30] Rather, the record demonstrates a sufficient manifestation

---

[30] Given the media attention and legal scrutiny this case was sure to garner, we concur with the trial court that "[i]t is difficult to understand why the police

of Appellant's intent to waive those rights because, after being informed of his *Miranda* rights, Appellant proceeded to answer Agent Esquibel's questions. *Clemons*, 200 A.3d at 520. Therefore, Appellant's challenge to the trial court's denial of his amended *omnibus* motion on this basis is without merit.

## Issue 2 – Trial Error

In his second issue, Appellant raises an evidentiary issue, asserting that the trial court erred in compelling Appellant to perform "a woman's sexy walk" in front of the jury after the Commonwealth asked him to do so on cross-examination. Appellant's Brief at 29-41.

We review of a trial court's decision to admit certain evidence as follows:

> [T]he admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill[-]will.

*Commonwealth v. Wilson*, 273 A.3d 13, 19 (Pa. Super. 2022) (citation and original brackets omitted), *appeal denied*, 285 A.3d 324 (Pa. 2022). While "[r]elevance is the threshold for admissibility of evidence[,]" *Commonwealth*

---

did not record the reading of the [*Miranda*] warnings or obtain a written waiver from [Appellant]." Trial Court Opinion, 1/20/21, at 33 (explaining that, "[t]he police obviously had good recording equipment with them, as the high-quality recording of [Appellant's] statement demonstrates"); *see also* N.T., 7/9/20, at 75 (acknowledging the opportunity to read Appellant his *Miranda* rights a second time and obtain a waiver again once the recording device was activated).

*v. Tyson*, 119 A.3d 353, 358 (Pa. Super. 2015) (*en banc*), *appeal denied*, 128 A.3d 220 (Pa. 2015), our primary task in the context of this appeal is to address whether Appellant waived his evidentiary challenge for failure to raise an objection at trial. "The applicability of waiver principles presents a question of law, over which our standard of review is *de novo* and our scope of review is plenary." *Stapas v. Giant Eagle, Inc.*, 198 A.3d 1033, 1037 (Pa. 2018).

"[I]t is axiomatic that issues are preserved when objections are made timely to the error or offense[,]" and the "failure to offer a timely and specific objection results is waiver of the claim[.]" *Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008), *cert. denied*, 558 U.S. 821 (2009). In order to preserve a challenge to the admissibility of evidence for appellate review, Pennsylvania Rule of Evidence 103(a)(1) requires a party to make "a timely objection, motion to strike, or motion *in limine*" that "states the specific ground, unless it is apparent from the context," for the objection. Pa.R.Evid. 103(a)(1)(A) and (B). "The rule is well[-]settled that a party complaining, on appeal, of the admission of evidence in the [trial] court [] will be confined to the specific objection there made." *Commonwealth v. Cousar*, 928 A.2d 1025, 1041 (Pa. 2007) (original brackets omitted), *citing Commonwealth v. Boden*, 159 A.2d 894, 900 (Pa. 1960), *cert. denied*, 553 U.S. 1035 (2008). "[E]ven where a defendant objects to specific conduct, the failure to request a remedy such as a mistrial or curative instruction is sufficient to constitute waiver." *Commonwealth v. Sandusky*, 77 A.3d 663, 670, (Pa. Super. 2013) (citation omitted). "Issues not raised in the trial court

are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

Here, concerning the Commonwealth's request on cross-examination that Appellant replicate the way the victim walked, Appellant asserts that this request "by which [Appellant] had to unwillingly give a humiliating, demeaning[,] and emasculating cross-gender performance, had the effect of evoking base racial stereotypes that influenced the jury's perception of [Appellant] and the evidence presented at trial." Appellant's Brief at 29. Appellant argues that the trial court, in its Rule 1925(a) opinion, "recognized that the [Commonwealth's] demand for [Appellant] to perform before the jury was improper," and the trial court "would have disallowed the performance **had a proper objection been made**." *Id.* at 30 (emphasis added). Appellant contends that a *de facto* objection was made, at a minimum, and "that both [Appellant] and his counsel objected to the demand, even if the words 'I object' were not used." *Id.* at 30, 35. Appellant asserts that a "fair reading of [the portion of trial transcript regarding this issue] is that defense counsel, having already expressed his opposition, saw which way the discussion was heading[,] and acquiesced in order to make the best of a bad situation." *Id.* at 36.

The trial court, in addressing Appellant's evidentiary challenge in its Rule 1925(a) opinion, found the issue was waived because "trial counsel, who was explicitly asked if he wanted to object, declined to do so." Trial Court Opinion, 1/4/22, at 43. We agree.

The pertinent excerpt from the trial transcript is as follows:

| [Commonwealth:] | So I think yesterday I thought you said that she had a saucy walk, but today you said sassy?[31] |
|---|---|
| [Appellant:] | Yeah. |
| [Commonwealth:] | Which one is it? |
| [Appellant:] | It's the same word. Sassy, saucy. Saucy, sassy. I don't know. |
| [Commonwealth:] | Those are the same to you? |
| [Appellant:] | I mean, yeah. I mean, I don't know the difference between one and two letters. I don't know that. |
| [Commonwealth:] | That's fine. So did she have the sassy or saucy walk as she's holding the leash for her dog? |
| [Appellant:] | Yeah. |
| [Commonwealth:] | Your Honor, may [Appellant] be permitted to step off the witness stand and demonstrate for us the walk that he's describing? |
| [Trial Court:] | Sure. You can do that. |
| [Appellant:] | Do you know how they walk when they doing the - |
| [Commonwealth:] | When you say they, do you just mean women? |
| [Appellant:] | Yeah. When they doing like a clothing exhibition or some stuff like that? |

_____

[31] During his direct testimony on the previous day, Appellant, in fact, described the victim's walk as "sassy." N.T., 5/19/21, at 192 (stating, "It was – when I saw [the victim] walking down, she was walking – I don't know if you guys know the word sassy. She was, like, swinging.").

| | |
|---|---|
| [Commonwealth:] | No, I don't. |
| [Appellant:] | You don't know? |
| [Commonwealth:] | No. |
| [Appellant:] | Fashion shows.  You know that? |
| [Commonwealth:] | The way this works is I ask you questions, and you answer them. |
| [Appellant:] | I don't want to walk like a woman.  That's what I'm trying to say.  I'm not a woman.  I'm not trying to do that stuff. |
| [Commonwealth:] | But this jury is being asked by you to regard your impression of [the victim] based upon a description, a one-word description.  I'm asking you, can you show us how it was that she walked? |
| [Defense Counsel:] | Your Honor, [Appellant] has indicated that she was walking like a model on a runway in a fashion show.  He's indicating that he doesn't want to walk like a woman.  How much more does the jury have to hear?  I think we all can take judicial notice - |
| [Appellant:] | She was walking like a model. |
| [Commonwealth:] | So what we're doing here is we're going to allow the witness to refuse to answer a question because he doesn't feel comfortable. |
| [Appellant:] | I'm not refusing. I'm just - |
| [Trial Court:] | Hold on.  **Is there an objection?** |
| [Defense Counsel:] | **If [the Commonwealth] insists that [Appellant] walk like a woman, [Appellant] can do his best imitation of a woman that he would know.** |
| [Trial Court:] | Okay.  You have to comply. |
| [Appellant:] | Man, that's weird.  Do you guys want me to do it? |

| [Trial Court:] | You can't talk to the jury sir. You can't talk to them. |
| [Appellant:] | Here goes nothing. Sorry if I don't do it right. She was holding the dog. I don't remember what hand she was holding. She was walking, you know, like - I just feel weird, you know. I feel weird. |
| [Commonwealth:] | Thank you. |
| [Trial Court:] | You can be seated, sir. |
| [Defense Counsel:] | Your Honor, I'd like the record to reflect that [Appellant] was sashaying in front of the jury. |
| [Trial Court:] | That's your word. I would disagree with that, I guess. |
| [Commonwealth:] | So that's how she walked out to your car? |
| [Appellant:] | Yeah. That's how she walked. |

N.T., 5/20/21, at 62-65 (emphasis added).

Although defense counsel's statement – "How much more does the jury have to hear? I think we all can take judicial notice." – appears to be an attempt to bring closure to the Commonwealth's request for a demonstration that was "fraught with evidentiary problems," this statement does not amount to a specific objection, much less a generalized objection that can be understood from the context of the statement. Appellant's argument that this statement expressed defense counsel's opposition and, therefore, is the equivalent of an objection, *i.e.*, a *de facto* objection, is negated further by the fact that the trial court specifically asked defense counsel if there were an objection, to which defense counsel conceded to the admissibility of the

- 43 -

evidence by replying, "If [the Commonwealth] insists that [Appellant] walk like a woman, [Appellant] can do his best imitation of a woman that he would know."[32]  A concession that the evidence is admissible is insufficient to preserve the issue for appellate review.  ***Commonwealth v. Cohen***, 410 A.2d 1264, 1265-1266 (Pa. Super. 1979) (indicating that, the withdrawal of an objection to the admissibility of evidence, thereby indicating that the evidence is admissible, does not preserve the issue for appellate review, even if the evidence is ultimately determined to be inadmissible); ***see also Commonwealth v. Wholaver***, 989 A.2d 883, 893 (Pa. 2010) (finding, defense counsel's indication that there was no objection to the admissibility of the evidence constitutes waiver of the issue), *cert. denied*, 562 U.S. 933 (2010); ***Commonwealth v. Lehman***, 275 A.3d 513, 529 (Pa. Super. 2022) (finding, defense counsel's statement that "he did not think this is the proper way to impeach a witness's credibility from some prior incident" did not

---

[32] In ***Commonwealth v. Vucich***, 194 A.3d 1103 (Pa. Super. 2018), defense counsel stated, "I put my objection on the record," and the trial court immediately replied, "It will be so noted."  ***Vucich***, 194 A.3d at 1107, n.1. This Court, in ***Vucich***, did not find waiver of the evidentiary issue despite defense counsel lodging a general objection because the trial court "readily apprehended the nature of [defense counsel's] objection" before a more specific objection could be put on the record.

In contrast, the trial court, in the case *sub judice*, specifically asked defense counsel if he had an objection to place on the record, thereby indicating, thus far, that the trial court was unaware that a specific objection had been raised. In reply, defense counsel failed to lodge an objection but, rather, acquiesced to the Commonwealth's request.

constitute an objection for purpose of preserving the issue on appeal (original quotation marks and brackets omitted)), *appeal denied*, 286 A.3d 213 (Pa. 2022); **Commonwealth v. Ames**, 2022 WL 17769538, at 5 (Pa. Super. filed Dec. 19, 2022) (unpublished memorandum) (stating, a finding that the issue has been waived on appellate review, "is an appropriate sanction because permitting a party to concede admissibility of evidence only to later complain on appeal creates a tactical advantage" (footnote omitted)).   Moreover, defense counsel's dialogue regarding the Commonwealth's request did not contain a request for a mistrial, a curative instruction, or a motion *in limine*. **Sandusky**, 77 A.3d at 670.   Consequently, we find that Appellant waived his challenge to the admissibility of the evidence in the form of Appellant performing a demonstration of the victim's walk for the jury.[33]

_____

[33] Appellant asserts, without citation to supporting caselaw, that this Court's "rigid adherence to the waiver doctrine should be reconsidered so as to permit review in exceptional cases, such as here, where the verdict is likely to have been the product of abhorrent bias."  Appellant's Brief at 39.  We find no support to up-end the well-established waiver principle requiring a defendant to raise the issue before the trial court, so the trial court may properly address the issue at that time, or face waiver of that issue on appeal. **Commonwealth v. Cornelius**, 180 A.3d 1256, 1262 (Pa. Super. 2018) (stating, "When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial[.  T]he motion shall be made when the event is disclosed.  Failure to object when the disclosure occurs constitutes waiver of the issue." (citations and original quotation marks omitted)).

Defense counsel's failure, in the case *sub judice*, to preserve this issue for appeal by placing a specific objection on the record contemporaneous with the Commonwealth's request for performance of a walk by Appellant, may give rise to a claim of ineffective assistance of counsel.   **See** 42 Pa.C.S.A.

## Issue 3 – Sufficiency of the Evidence

Appellant's third issue challenges the trial court's denial of his motion for judgment of acquittal on the ground the evidence presented by the Commonwealth was insufficient to disprove the mistake of age defense.[34] Appellant's Brief at 53-56.

Our standard and scope of review of a challenge to the sufficiency of the evidence are well-settled.

_____

§ 9543(a)(2)(ii).  Such a claim, however, is not before this Court in the case *sub judice*, and we cannot address it.

[34] Pennsylvania Rule of Criminal Procedure 606(A)(5) permits a defendant to "challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged" by orally moving for judgement of acquittal before sentencing pursuant to Pa.R.Crim.P. 704(B).  **See** Pa.R.Crim.P. 606(A)(5); **see also** Pa.R.Crim.P. 704(B)(1) (stating, "[u]nder extraordinary circumstances, when the interests of justice require, the trial [court] may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial").

Here, Appellant made a motion for judgment of acquittal at the close of the Commonwealth's case-in-chief, pursuant to Pa.R.Crim.P. 606(A)(1), which the trial court denied.  Pa.R.Crim.P. 606(A)(1) (permitting a defendant to "challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged" by orally moving for judgement of acquittal at the close of the Commonwealth's case-in-chief); **see also** N.T., 5/19/21, at 133-139.  Appellant also made an oral motion for judgment of acquittal prior to sentencing, which the trial court denied.  N.T., 8/17/21, at 5-10, 18. Because Appellant asserts, in his third issue, that there was insufficient evidence presented by the Commonwealth to disprove a mistake of age defense, which must be asserted by a defendant, as discussed more fully *infra*, and Appellant relies upon evidence presented during his case-in-chief in support of his motion, it appears Appellant is challenging the trial court's denial of his oral motion for judgment of acquittal that was presented prior to sentencing.

- 46 -

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier[-]of[-]fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Pappas*, 845 A.2d 829, 835-836 (Pa. Super. 2004) (citation omitted), *appeal denied*, 862 A.2d 1254 (Pa. 2004); *see also Commonwealth v. Brown*, 52 A.3d 1139, 1163 (Pa. 2012) (stating that, in reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier[-]of[-]fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)); *Commonwealth v. Stahl*, 175 A.3d 301, 303-304 (Pa. Super. 2017) (applying the same standard of review, as set forth *supra*, for a sufficiency claim that arose in the context of a motion for judgment of acquittal), *appeal denied*, 189 A.3d 389 (Pa. 2018).

> [T]he [trier-of-fact's] individualized assessment of the credibility of the trial evidence is, as a general principle, not to be questioned by an appellate court as part of its review, even if the evidence is conflicting. [C]ourts presume the [trier-of-fact] resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. [M]ere inconsistency and conflicts in witnesses['] testimony, by itself, will not furnish a basis for an appellate court to reverse a conviction [] on the grounds of evidentiary insufficiency.

**Brown**, 52 A.3d at 1165 (citations omitted). Rather, the trier-of-fact's resolution will only be disturbed "in those exceptional instances [] where the evidence is so patently unreliable that the [trier-of-fact] was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence."

**Id.**, *citing* **Commonwealth v. Karkaria**, 625 A.2d 1167, 1170 (Pa. 1993).

It is well-established that,

> In any criminal prosecution, the Commonwealth has the unshifting burden to prove beyond a reasonable doubt all elements of the crime charged. The burden is neither increased nor diminished when a defendant attempts to disprove an element of the crime by introducing an affirmative defense[, such as the mistake of age defense]. Accordingly, when charging a jury, a trial [court] must communicate to the jury that when evidence of an affirmative defense is offered, the Commonwealth still has the burden to prove each element of the crime charged beyond a reasonable doubt. Thus, the burden never shifts to the defendant. Moreover, the trial [court] must state that the jury's determination that the affirmative defense has not been established is essential to finding that the Commonwealth has met its burden.

**Commonwealth v. Cottam**, 616 A.2d 988, 1000-1001 (Pa. Super. 1992) (citations omitted), *appeal denied*, 636 A.2d 632 (Pa. 1993); **see also**

**Commonwealth v. Scott**, 73 A.3d 599, 603 (Pa. Super. 2013).

Section 3102 of the Crimes Code sets forth the mistake of age defense as follows:

> Except as otherwise provided, whenever in this chapter the criminality of conduct depends on a child being below the age of 14 years, it is no defense that the defendant did not know the age of the child or reasonably believed the child to be the age of 14 years or older.  When criminality depends on the child's being below a critical age older than 14 years, it is a defense for the defendant to prove by a preponderance of the evidence that he or she reasonably believed the child to be above the critical age.

18 Pa.C.S.A. § 3102.[35]  Thus, "Section 3102 places the initial burden on the **accused** to prove [a] mistake of age" defense.  ***Commonwealth v. Bohonyi***, 900 A.2d 877, 884 (Pa. Super. 2006) (emphasis in original), *appeal denied*, 917 A.2d 312 (Pa. 2007).  Once a mistake of age defense has been proffered by a defendant, the burden shifts to the Commonwealth to disprove the defense.  ***Bohonyi***, 900 A.2d at 884 (stating, "the Commonwealth bears no

---

[35] We concur with the trial court that the mistake of age defense was appliable to all of Appellant's aforementioned convictions except his conviction at 5098-CR-2019 of corruption of minors under 18 Pa.C.S.A. § 6301(a)(1)(i). Trial Court Opinion, 1/4/22, at 69 n.4.  The corruption of minors charge at 5098-CR-2019 related to acts by Appellant that were not a violation of Chapter 31 of the Crimes Code (relating to sexual offenses).  Specifically, Appellant's conduct that led to the charge of corruption of minors at 5098-CR-2019 was his communication with the victim about graphic sexual matters in a way that corrupted or tended to corrupt the morals of the victim during the period of June 2, 2019, through June 6, 2019, when the victim's actual age was less than 16 years.  **See** N.T., 5/20/21, at 211-212; **see also** 18 Pa.C.S.A. § 6301(a)(1)(i); 18 Pa.C.S.A. § 6301(d)(1) (stating, "[w]henever in this section the criminality of conduct depends upon the corruption of a minor whose actual age is under 16 years, it is no defense that the actor did not know the age of the minor or reasonably believed the minor to be older than 18 years").

- 49 -

burden of proof regarding the defendant's knowledge of or belief as to the age of the child victim" until the defendant proffers the defense); *see also* ***Commonwealth v. A.W.C.***, 951 A.2d 1174, 1181 n.5 (Pa. Super. 2008) (stating, "the Commonwealth [bears] no burden of proof regarding [a defendant's] knowledge of or belief as to the age of [the victim] until after [the defendant] asserts a mistake of age defense").

Here, Appellant asserts that he "met his burden of production with overwhelming evidence that he was mistaken about [the victim's] actual age[ and the] Commonwealth bore the burden, which it failed to satisfy, of disproving his reasonable mistake of [the victim's] age beyond a reasonable doubt."[36]  Appellant's Brief at 53-54.  Appellant contends,

---

[36] Appellant asserts that,

> [The victim] knew that people thought she looked older than her actual age and she took full advantage of this fact in her reverse grooming of [Appellant.  The victim] had no reason to believe that [Appellant] considered her age to be anything other than what she told him.

Appellant's Brief at 54 (citations to reproduced record omitted).

To the extent that Appellant contends that the victim's beliefs regarding "how old she looked" established, conclusively, the mistake of age defense, we find this argument misplaced.  The victim's beliefs as to how old she appeared to Appellant are irrelevant to determining Appellant's beliefs and knowledge of the victim's actual age.  ***See Commonwealth v. Fetter***, 770 A.2d 762, 768 (Pa. Super. 2001) (stating, in establishing a mistake of age defense, "the victim's beliefs as to how old she[, or he,] looks [are] irrelevant to [determining a defendant's] beliefs and knowledge of her[, or his,] actual age").

> The Commonwealth produced no direct evidence that [Appellant] knew that [the victim] was underage[.] The Commonwealth was left with attempting to counter [Appellant's] mistake of age defense through speculation and strained interpretations of ambiguous events. The Commonwealth fell far short of satisfying its burden of proving guilt beyond a reasonable doubt.

*Id.* (quotation marks, original brackets, citations to reproduced record, and ellipsis omitted).

In denying Appellant's motion for judgment of acquittal based upon the sufficiency of the evidence to disprove a mistake of age defense, the trial court explained,

> In this case, there is no direct evidence that [Appellant] knew that [the victim] was underage when he performed the prohibited acts, but there is ample circumstantial evidence of this knowledge. [The victim] admitted that she misrepresented her age when they first began corresponding, and she never did tell him her real age.[FN5]
>
>> [Footnote 5: Appellant] claims that [the victim] sent him a copy of a fake [identification card], but she denied that, and, aside from his claim, there was no evidence of this.
>
> However, the victim was only thirteen [] years old when they met for sex in [Westmoreland County] on August 21, 2017, and photographs of her appearance at that point in time were admitted into evidence. [Appellant] knew that [the victim] was living with her parents at that time, and he would have presumed that they disapproved of the relationship given the fact that she only suggested he visit when her parents were away. [The victim] never invited him into the [house] that day and never invited him to her home or suggested that he meet her family thereafter. If she were of age, there is no clear explanation of why [the victim's parents] would disapprove. [Appellant and the victim] attempted to have sex on August 21, 2017, but were unable because his penis did not fit. In the years following the meeting, [the victim] would tell [Appellant] on occasion that she couldn't communicate because her mother had taken away her [cellular tele]phone.

More than anything, [Appellant's] behavior after the meeting on August 21, 2017[,] suggests that he knew she was underage. [The victim] testified that [Appellant] told her not to tell anyone about their meeting. If [Appellant] believed [the victim] was of age, it is difficult to understand why he would tell her that. Reflecting on their only meeting, [Appellant] told [the victim] in the following years that he wanted to "finish what they started," meaning "breaking her p[***]y." Trooper Haslett's review of [the] content on [Appellant's] electronic devices from August 2018[,] to June 2019[,] revealed that [Appellant] told [the victim] he wanted to "stretch" that area. [The victim] testified that when she broke plans to meet [Appellant] at a hotel, he "would call her a little kid, tell her that she needed to grow up[.]" When she would fail to communicate with him, he would complain that she was never home, telling her that she was "a little kid and [she] played too much." Trooper Haslett's review of [the] content confirmed multiple instances of [Appellant] referring [to] her [as] a little kid or telling her to grow up. On April 8, 2019, after [the victim] sent [Appellant] a photograph of her wearing only underwear, he responded, "well, look at you[,] not the little kid I me[t] a few years ago[.]" On June 1, 2019, in response to a text indicating that [the victim] had gotten into trouble, [Appellant] sent her a text expressing alarm that she might have her [cellular tele]phone taken away. If he truly believed she was of age, it is difficult to understand why this would cause him concern.

Perhaps the most incriminating behavior [Appellant] engaged in took place after being confronted by [the victim's mother] about [the victim being a minor] in July 2019. At that time, [the victim's mother] had taken a screen shot of [] messages received by [the victim] from [Appellant] containing images of him in various stages of undress. [The victim's mother] forwarded those [screen shots] to [Appellant] from [the mother's cellular tele]phone, with a message indicating that [the victim] was a minor, and that she assumed his "career meant nothing to" him[.] If [Appellant] truly believed that [the victim] was of age at that time, one would expect that he would immediately respond to [the victim's] mother, indicating that he believed she was of age based on [the victim's] years-long misrepresentations. Instead, he did not respond at all. [Appellant] later testified that he thought the message he received from [the victim's mother] was "a joke," but his subsequent messages to [the victim] belie that. On July 23, 2019, [Appellant] confronted [the victim] about the text [message], asking "what the f[**]k was going on," and

- 52 -

threatening to forward to [the victim's] mother copies of the explicit text[ messages] that [the victim] had just sent to him. That is not how a person usually responds to a joke. Again, if [Appellant] believed, at that point, that [the victim] was underage, one would expect him to confront [the victim] about her misrepresentations. One would expect that he would ask her how old she was or why she [] lied to him. But, he never did. Instead, [Appellant] asked [the victim] how she could be so calm and indicated that he believed he was now in trouble. Those appear to be the statements of a person who knew he had broken the[] law.

Trial Court Opinion, 1/4/22, at 71-74 (record citations and original brackets omitted).

Upon assertion by Appellant of the mistake of age defense, the Commonwealth had the burden of proof regarding Appellant's knowledge of or belief as to the victim's age at the time of the various criminal acts. To reiterate, the Commonwealth may sustain its burden of proof by wholly circumstantial evidence. **Pappas**, 845 A.2d at 836. In addition to the evidence noted by the trial court, as discussed *supra*, and supported by the record, Appellant claimed that in late July 2017, or early August 2017, the victim sent him a photograph of an identification card *via* a social media application. The identification card, Appellant contends, contained the victim's birth date as proof that she was 17 years old and would be 18 shortly.[37] N.T., 5/19/21, at 173-181. Later, during cross-examination, Appellant stated that the photograph of the victim's identification card was sent *via* cellular

---

[37] We note that information, including photographs, sent *via* the social media application Appellant alleged the victim used for sending a photograph of her identification card, disappear after 24 hours.

telephone text messages in a series of more than 200 message exchanges between Appellant and the victim, many of which were presented as evidence at trial. N.T., 5/20/21, at 54. Regardless of the method the victim allegedly used to transmit a photograph of the identification card, physical evidence depicting the identification card was not presented at trial. Moreover, Appellant admitted at trial to having lied under oath in earlier court proceedings involving this case. *Id.* at 33. Appellant also denied telling Trooper Thompson that he "knew [the victim] was too young to have sex." *Id.* at 28.

The victim testified that in July 2017, she told Appellant she was 17 years old and that she would turn 18 years old on September 5th, without specifying the year. N.T., 5/17/21, at 153; *see also* N.T., 5/18/21, at 41-42. The victim often told Appellant that she was unable to communicate with him *via* her cellular telephone because her parents had taken her cellular telephone as punishment for when she got in trouble. N.T., 5/17/21, at 158; *see also* N.T., 5/20/21, at 22. The victim further testified that throughout her digital exchanges with Appellant, Appellant referred to her as "a little kid," told her that she needed "to grow up" and to stop acting like a little kid, and remarked that she was not the little kid he first met a few years ago in response to a photograph she sent him. N.T., 5/17/21, at 157-160; *see also* N.T., 5/18/21, at 112-113, 121-122. The forensic investigation of Appellant's electronic devises did not reveal any digital exchanges between Appellant and third parties in which Appellant referred to the third party as "a kid" or told the third

party "to grow up" during the conversations. N.T., 5/19/21, at 123. The investigation also did not uncover any messages between Appellant and the victim in which Appellant specifically referred to the victim's age, despite Appellant's claim that he received a photograph of an identification card and believed she was 17, about to turn 18, years old when they first began communication in July 2017. *Id.* Finally, upon receiving the text message from the victim's mother stating that the victim was a minor, Appellant's first question directed to the victim was not to ask how old she really was, but rather, Appellant testified that the first question he asked the victim was "are you showing my stuff [(, *i.e.*, the photographs Appellant sent the victim,)] to anybody?" N.T., 5/20/21, at 25.

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, there is sufficient evidence to enable the jury, as trier-of-fact, to find the Commonwealth disproved Appellant's asserted mistake of age defense. The jury, as the ultimate fact-finder in the case *sub judice*, was free to pass on the credibility of witnesses and the weight of the evidence produced and to believe all, part, or none of the evidence in reaching its verdict. The record demonstrates that the jury was properly instructed on the mistake of age defense. *Id.* at 204-210, 212-213. As such, the trial court, as well as this Court, are bound by the jury's credibility determinations. We discern no abuse of discretion or error of law in the trial court's denial of Appellant's motion for judgement of acquittal. Therefore, Appellant's third issue is without merit.

**Issue 4 – Weight of the Evidence**

In his final issue, Appellant raises a claim that the verdict is against the weight of the evidence, for which our standard and scope of review is as follows:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial [court] had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial [court] when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Commonwealth v. Horne***, 89 A.3d 277, 285 (Pa. Super. 2014), *citing* ***Commonwealth v. Widmer***, 744 A.2d 745 (Pa. 2000). A trial court abuses its discretion "where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill-will." ***Horne***, 89 A.3d at 285-286 (citation omitted); ***see also Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (stating, "[t]he term 'discretion' imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the [trial court]"). For an appellant to prevail on a weight of the evidence claim, "the evidence must be so tenuous, vague[,] and uncertain that the verdict shocks

the conscience of the [trial] court." ***Commonwealth v. Sullivan***, 820 A.2d 795, 806 (Pa. Super. 2003) (citation and internal quotation marks omitted), *appeal denied*, 833 A.2d 143 (Pa. 2003).

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable [or] contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review.

***Commonwealth v. Bowen***, 55 A.3d 1254, 1262 (Pa. Super. 2012), *appeal denied*, 64 A.3d 630 (Pa. 2013).

Preliminarily, we must address whether Appellant preserved his weight claim since the failure to present such a claim to the trial court constitutes waiver of a challenge to the weight of the evidence. ***Commonwealth v. Weir***, 201 A.3d 163, 167 (Pa. Super. 2018), *aff'd*, 239 A.3d 25 (Pa. 2020) (stating, "a challenge to the weight of the evidence must be raised with the trial [court] or is waived"); ***see also*** Pa.R.A.P. 302(a) (stating, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Pennsylvania Rule of Criminal Procedure 607(A) requires a challenge to the weight of the evidence to be raised with the trial court in a motion for a new trial that is presented "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A)(1-3) (formatting modified).

Here, Appellant asserts that trial counsel preserved a weight of the evidence claim by presenting an oral motion for a new trial, on the record, prior to sentencing as follows:

> I [(trial counsel)] would also note, Your Honor.  I can incorporate [my motion for judgment of acquittal] in the motion for a new trial, but this is not a trial, and this jury were not peers of [Appellant].  There was not a minority person in the jury pool that we walked through, looking for anybody who might be remotely like [Appellant] who potentially could understand [Appellant].  This case was never going to be about the evidence for this jury, Your Honor.  This case was about race.  This case was about a black man, Hispanic black man, who's 6 foot 2 [inches tall] and weighed 220 pounds, and a young white female.  This jury wasn't listening to the evidence because if they did, they would have – our mistake of age [defense] would have been upheld. They were offended by the idea that this man, this black man, [a] professional athlete, would be involved sexually with a young white female, and the jury disregarded every bit of evidence that was exculpatory in this case.  This jury was predisposed to convict is what I'm saying to you, Your Honor.

N.T., 8/17/21, at 10.

Although trial counsel did not articulate his motion for a new trial with a clear statement specifying a challenge to the weight of the evidence, *i.e.*, counsel did not use the words "weight of the evidence" or "shocks one's conscious," a sensible reading of trial counsel's oral motion for a new trial indicates that his challenge forwarded a claim alleging that the verdict was against the weight of the evidence because the jury entirely disregarded Appellant's exculpatory proof regarding the mistake of age defense and returned a verdict motivated by its racial bias against Appellant.  Therefore, under the specific circumstances of the case *sub judice*, trial counsel preserved

Appellant's weight of the evidence claim. *See Commonwealth v. Keaton*, 45 A.3d 1050, 1074 (Pa. 2012) (stating, there is no basis to grant a new trial unless the prejudice of the jury, with a fixed bias and hostility towards the accused, prevents the jury from weighing the evidence and rendering a true verdict); *see also Commonwealth v. Marrero*, 687 A.2d 1102, 1110 (Pa. 1996) (stating, a weight claim may be premised on the assertion that no reasonable jury could have reached its verdict unless the verdict were the result of confusion, bias, or prejudice).

In challenging the trial court's denial of his motion for a new trial based upon a weight of the evidence claim, Appellant asserts,

> Given the efforts to which [the victim] went to lure [Appellant] into believing that she was just shy of her 18th birthday and the absence of direct evidence that [Appellant] knew that [the victim] was underage, the jury's rejection of the mistake of age defense must be viewed as manifestly erroneous, arbitrary and capricious[,] or flagrantly contrary to the evidence. This is especially true given that the verdict was the product of a jury tainted by the racially stereotyped performance evidence allowed by the [trial] court [(referring to the Commonwealth's request that Appellant imitate the victim's walk for the jury).] In light of all of these factors, the verdict can only be viewed as contrary to the weight of the evidence. Therefore, the [trial] court's denial of [Appellant's] motion for a new trial is a manifestly prejudicial abuse of discretion.

Appellant's Brief at 57-58 (quotation marks, original brackets, and citations omitted).

To reiterate, this Court's review of a weight claim is limited to whether the trial court's denial of a new trial based upon a weight of the evidence claim was manifestly unreasonable or a result of partiality, prejudice, bias, or ill-will.

*Horne*, 89 A.3d at 285-286 (stating, the role of an appellate court is not to review whether the verdict was against the weight of the evidence, that role is exclusively reserved for the trial court, who was in the best position to have seen and heard the evidence).

> In denying Appellant's motion for a new trial, the trial court stated,
>
> With regard to the argument for the new trial, I met with the attorneys ahead of time in detail, and we went through the proposed *voir dire*, and there were proposed questions by [Appellant's trial counsel] to determine whether the jury would be biased against [Appellant] on the basis of race. [M]y recollection is that I permitted each of the questions that [trial counsel] suggested with regard to race, with regard to determining whether any juror member would be biased because of race. The parties had an opportunity to object, to make challenges for cause with regard to each of the [potential jurors] during the *voir dire* process, and I don't recall overruling any objection that was made by [trial counsel] making a preemptory [challenge] or making a challenge for cause on the basis of race. I don't recall if any challenges for cause were made on the basis of race. I have had jurors in cases indicate that they were prejudiced, which is shocking to me, but I don't – if that happened in this case, I certainly, without hesitation, struck those jurors from consideration. And again, [trial counsel] had an opportunity to make preemptory challenges and more importantly have unlimited challenges to cause, and I don't recall denying any challenge to cause based on race. I don't believe there is anything further that the [trial c]ourt could have done to make it – to create an environment where racial prejudice did not enter into the decision-making process. So[,] for those reasons and others, I mean again, I'm mentioning the reasons that come to mind, not hav[ing] been aware that these motions would've been made, and I'm sure there are other reasons. I know there are other reasons for the denial of those motions, but I am going to deny [the motion for a new trial].

N.T., 8/17/21, at 17-18. The trial court further explained its rationale for denying Appellant's request for a new trial as follows:

[T]he jury's verdict in this matter does not "shock the conscience." This is especially true given the credibility issues involving [Appellant.] While the victim certainly admitted having lied to [Appellant] and to her family in the past, she was believable at trial. On the other hand, there were numerous instances of [Appellant] lying in court and to the government. When Trooper Thompson was interviewing [Appellant] on September 17, 2019, [Appellant] denied having corresponded with [the victim] until confronted with proof. He then denied having attempted [intercourse] with [the victim] until confronted with proof. On direct examination [at trial, Appellant] admitted that in a previous proceeding, he [] lied under oath, denying that the August 2017 incident in [Westmoreland County] had even occurred. If [Appellant] lied under oath in the past in order to extricate himself from a troublesome situation, there was no reason to believe he would not lie again. On cross-examination, he admitted that his statements on direct examination about believing the text [message] from [the victim's mother were] a joke and confronting [the victim] about her misrepresentations on age were questionable. In short, based on the substantial direct and circumstantial evidence introduced by the Commonwealth and [Appellant's credibility] issues, the weight of the evidence was great enough to support the convictions.

Trial Court Opinion, 1/4/22, at 77-78.

At the outset, we find trial counsel's assertion that his argument in support of his sufficiency of the evidence claim is "equally applicable" to his weight of the evidence claim to be misplaced. *See* Appellant's Brief at 57. A claim challenging the sufficiency of the evidence is distinct from a claim that the verdict is against the weight of the evidence and, as such, the arguments should be distinct. ***Widmer***, 744 A.2d at 751-752.

A claim challenging the sufficiency of the evidence is a question of law. . . . Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. . . .

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, **concedes that there is sufficient evidence to sustain the verdict**. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court.

***Id.*** (citations omitted, emphasis added).

Critical to finding Appellant guilty of the aforementioned criminal offenses was the jury's assessment of the evidence and its determination of witness credibility. As the trial court discussed in denying Appellant's motion for a new trial, Appellant admitted to having lied several times while under oath or in speaking with law enforcement. As such, the jury's rejection of Appellant's version of events finds support in the record. Also, the digital exchanges between Appellant and the victim, while subject to some level of interpretation, were compelling and could easily be said to have established, at the very least, a perpetrator who harbored doubts about the victim's age but who turned a willfully blind eye to multiple obvious warning signals in order to pursue his prurient interests.

Appellant's allegation that "the jury's rejection of the mistake of age defense" was contrary to the evidence invites this Court to do nothing more than reassess the witnesses' credibility and reweigh the evidence in an attempt to convince us to reach a result different than the one reached by the jury, as fact-finder. We decline Appellant's invitation since the jury, as the ultimate fact-finder, while passing on the credibility of the witnesses and the weight of the evidence, was free to believe all, part, or none of the evidence.

*Commonwealth v. Dunkins*, 229 A.3d 622, 631 (Pa. Super. 2020), *aff'd*, 263 A.3d 247 (Pa. 2021), *cert. denied*, 142 S.Ct. 1679 (2022). The record demonstrates that the jury was properly instructed on the mistake of age defense. N.T., 5/20/21, at 204-210, 212-213. Therefore, the trial court, as well as this Court, are bound by the jury's credibility determinations. The testimony, taken together with the substantial quantity of circumstantial digital evidence presented at trial, easily surpassed the threshold applied by an appellate court in the context of a weight claim. Consequently, based upon our review of the record and the trial court's rationale for denying Appellant's motion for a new trial based on a weight of the evidence claim, we discern no abuse of discretion in the trial court's determination that the verdict was not against the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/13/2023